## Chadwell v. Commonwealth.

(Decided October 11, 1929.)

HIRAM H. OWENS for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant and defendant below, G. C. Chadwell and one Andrew Black, were jointly indicted by the Knox grand jury and accused of murdering John Walters. At the separate trial of appellant under that indictment, he was convicted of voluntary manslaughter, and punished by confinement in the penitentiary for a period of five years, and to reverse the judgment, and the order of court overruling his motion for a new trial, appellant prosecutes this appeal, urging, through his counsel, as grounds therefor: (1) That the verdict is flagrantly against the evidence and not supported by it; (2) incompetent evidence offered and introduced by the commonwealth over defendant's objections; (3) competent evidence offered by him which the court rejected; and (4) error of the court in not keeping the jurors together while deliberating upon their verdict, each of which will be considered and determined in the order stated.

1. The killing occurred on the public highway between Corbin and Barbourville, Ky., and about half a mile east of Corbin, on October 20, 1928, at about 7:30 p. m. The deceased owned an automobile and was driving it on the night of the homicide. He and Norton Logan had traveled that evening from Black Star, in Harlan

county, on their way to Corbin, which was their ultimate destination. En route, and before they arrived at the store of appellant on the pike about a mile east of Corbin, they picked up pedestrians and left them at the places where they desired to stop. When they arrived at the store of appellant, no one was then in the automobile, except the deceased and Logan. The two stopped at that store and bought some bottled coca-cola and ate a lunch of some kind, all of which consumed about 30 minutes. Appellant and Black, his codefendant in the indictment, were present at the store, as was also the owner of the store building, on whose land it stood, one Easom Reece.

While eating the lunch and drinking the coca-cola at appellant's store, the evidence shows that deceased and Logan produced a bottle containing whisky, and that all of those present drank some of it; but defendant says that he did not touch it, although the evidence in the case shows that, if he failed to do so, it was contrary to his usual custom, since it appears from the record that he has no conscientious scruples against taking a drink. There is also evidence that deceased and Logan had consumed some intoxicants before they arrived at that store, but it by no means appears that they did so to the extent contended for by attorney for appellant. It likewise appears that Logan was considerably more intoxicated than was the deceased when they first arrived at the store of appellant; but the latter himself did not testify that the deceased was extremely intoxicated, but only that he "was mighty talkative," and that "anybody could tell that Logan was drunk." From the testimony of Reece, who admitted he took a drink of the liquor produced by the travelers, it is quite conclusive to our minds that all parties in that crowd tested the liquor that deceased and Logan had with them on that occasion. What took place at the time of the departure from the store in continuing the journey is in dispute.

Chadwell and Black lived between the store and Corbin, but off the main highway; they residing on opposite sides thereof. The witness Reece testified that, while deceased and Logan were eating their lunch, the parties talked generally, but "principally about the election," and that deceased acted sensibly and behaved himself perfectly, and, in substance, that if he was drunk witness could not discover it, and that when he and Black left appellant's store Chadwell said something about "riding a piece (of the way) if they (deceased and Logan) did not care," to which deceased responded that they could

do so, if they were not drunk, since he already had one man who was drunk and wanted no more. On the other hand, appellant and Black testified that they declined seats in the car at that time, stating that they had but a short way to go, and would walk; whereupon deceased insisted that they ride in the back seat of his car (the front being occupied by himself as driver and by Logan), and that they complied therewith and got in the car.

The deceased in his dying declaration (hereinafter considered) stated that when he got into his car to leave the store, and after defendant and Black had also gotten in it, and after they had started, he discovered that his gloves were missing, and some conversation ensued about them, and the two defendants in the indictment then requested that they be taken to Corbin, and that they would. then see about the gloves, and after again starting the car, which appears to have been checked or stopped at that time, he "felt something hit him in the back, and as he turned around appellant took hold of his hand and shot him in the mouth." Logan does not mention anything about the gloves, but testified that appellant, who was riding immediately behind deceased on the left side of the car, fired a shot at the latter, which penetrated his clothing near the top of the shoulder, its exit being in front, but above where it entered, indicating that the wearer of the clothes was stooped over at the time that shot was fired. That bullet produced only a slight flesh wound, and the bullet through the mouth entered, of course, from the front, all of which accords with the dying declaration that deceased, upon receiving the shoulder wound from the rear while fixing some part of the running gear, was in a stooping position, and he then turned around and received the shot in his mouth. He also received a shot in one of his hands, and appellant admits that he fired three shots. Deceased lived for three weeks, during which time he made his dying declaration, which he repeated several times before his death, the last one of which was either on the day of his death or the one before.

Appellant in his testimony said that, just after leaving the store, and immediately after crossing Spider creek, about halfway between the store and Corbin, deceased stopped the car on the right-hand side of the road, and told him and Black to get out of it, and he then called them "bad names," but which language he does not repeat. However, according to him, they did get out.

and that they were then about 150 yards from the roads leaving the highway to their residences, and they walked to within about 20 feet of those roads, when they were overtaken by deceased and Logan, both of whom were in the automobile on the front seat, and that deceased then said, ''You fellows load in here, I am going to take you to town;'' whereupon appellant stated, ''No, brother; I aint going to town, thank you;'' that deceased again called them bad names (without stating his words), and shoved a gun in the faces of the two pedestrians, and ordered them to get in the car, but that he (appellant) left his feet on the running board with the view of jumping off the first chance; that deceased discovered that fact, and at the point of his pistol ordered him to put his feet in the car and close the door, which he did; and that a short distance therefrom deceased again stopped the car and whirled around with a pistol in his hand, pointing it at appellant, whereupon the latter fired his pistol three times, producing the described wounds; which eventually resulted in the death of the deceased. While Logan does not remember any controversy about the gloves of deceased, his testimony substantially corroborates the manner of the killing stated in the dying declaration.

It will thus be seen that both sides give a most unusual account of how the controversy arose and the incidents leading up to the shooting of the deceased. For that reason it is strenuously argued that Logan's testimony and the dying declaration are unbelievable, and that neither one, nor the two combined, is sufficient to sustain the verdict. The fact, however, seems to be overlooked by learned counsel that the account of how the tragedy occurred, as given by the defendants in the indictment, is as much, if not more, out of harmony with normal conduct as is the story told by the deceased and the witness Logan. It is clearly apparent that the killing of the deceased was indirectly the result of a brawl, superinduced by the consumption of liquor by the two participants therein, or at least by one of them, and that the solution of the question was essentially one for the jury under the testimony adduced at the trial. The only other intimated theory for the killing was and is a remote one, based upon the testimony of Logan, that while at the store Walters, who had a $50 bill in his pocket, exhibited it to the members of the crowd there assembled, two of which, as we have seen, were the defendants in the indictment.

After the shooting, Chadwell, Black, and Logan went to the nearby residence of appellant's brother, and he carried them to the city of Corbin, passing the place where the shooting occurred; but the car in which it happened was not there, deceased having driven it away to the residence of a relative or friend in Laurel county, where he remained until his death. Many of the witnesses who testified to the salient facts are contradicted in some particulars, and especially is that true of Logan. But, surely, counsel allows his enthusiasm for his client's cause to control him in making his insistence that the verdict is flagrantly against the evidence, more than being influenced by the thoroughly established rule in this court to the effect that conflicts in testimony are to be reconciled by the jury, unless one side sufficiently overcomes the testimony of the other to such an extent as to indicate passion and prejudice on the part of the jury in adopting the weaker side as a basis for its verdict. But that condition does not exist here, even if we should find that the laudations of counsel for his client are justified, but which in several particulars we do not find to be true.

It will be observed that the story of the killing as given by appellant is, to say the least of it, extremely incredible, and his conduct on the occasions he describes does not comport with human action under similar circumstances, but is in radical departure therefrom. According to his testimony, the deceased was cursing and applying to him vile epithets ("bad names"), and at the same time pointing his pistol at appellant; but it never occurred to the latter to shoot deceased until he got ready to get out of the automobile. Strange indeed was the fact, as testified to by appellant, that deceased could drive the car, wave a pistol, and force obedience to his commands all at the same time and with his back to appellant. Both Black and appellant were behind deceased, and Logan, whom they say had been forced by deceased to vacate his seat in front and take one in the seat with the two defendants in the indictment, were all on the back seat, and Logan so drunk that he did not know what was going on, and, if true, he was entirely disabled from assisting deceased. According to the defendant's testimony, he and Black, or either of them, would have had no trouble in overpowering deceased and preventing him from committing any harm to either of them, without resorting to the use of a pistol and killing deceased; and

in that view of the case the jury were authorized to conclude that appellant used more force than was necessary, even if his account of the difficulty should in all other respects be accepted as true. It is, therefore, our conclusion that this ground is without merit, and it is overruled.

2. The incompetent evidence complained of under this ground consists chiefly, if not entirely, in the introduction of the dying declaration, which it is claimed was not given in extremis, so as to authorize its introduction; but we cannot agree with that contention. Two witnesses testified to the dying declaration of deceased and they were his sister, who was with him from the night he was shot until his death, and a Mr. Brewer, who saw him on several occasions between those dates. From their testimony it is inferable that at the first time the deceased repeated his dying declaration he may have entertained expectations of surviving, but they each stated that for several days before his death he had surrendered all hope of living and resigned himself to his final fate, and during which time he repeated the dying declaration as testified to by the witnesses. We have frequently held that a dying declaration, given at a time when, for the reasons herein relied on, it would have been incompetent, is rendered admissible, if approved by the deceased after he had lost all hope of recovery. It is unnecessary to cite those cases in this opinion, since there are none, at least in this jurisdiction, to the contrary. It is apparent that this ground cannot be sustained.

3. The complaint under ground (3) relates to the failure of the court to permit two witnesses to state that Logan, on the next morning after the shooting, stated in their presence that he was too drunk to remember what occurred. Just why the court rejected that testimony we are unable to discover, and if those two were the only witnesses on that point the error might be sufficiently prejudicial to authorize a reversal. But other witnesses were permitted to so contradict Logan, and an examination of the record convinces us that the jury were not prejudicially influenced by the complained-of action of the court as a foundation for this ground. A true picture of the witness Logan, and of his condition, was permitted to be drawn and presented before the jury. Defendant, Black, and to some extent Reece testified as to his intoxicated condition on the night of the shooting, and, as we have already stated, other witnesses testified to his contradicting remark, and because two other witnesses

were not also permitted to do so does not, in our opinion, constitute grounds authorizing a reversal of the judgment. See Fields v. Commonwealth, 225 Ky. 655, 9 S. W. (2d) 990. We therefore conclude that there is no merit in this ground.

4. In support of ground (4) it is stated in brief of counsel for appellant that the jury that tried defendant consisted of eight men and four women, one of whom was Mrs. Grant Hampton, and that she was sworn to keep the women members of the jury together, while the sheriff was sworn to keep its male members together. There is nothing in the bill of exceptions to that effect, but the order overruling the motion and reasons for a new trial recites this ground, and then states that the court pursued that course, not only with the consent of appellant and his counsel, but at the suggestion of the latter, and which is also admitted in brief. We know of no law forbidding such consent, or any entitling a defendant to repudiate it after it had been given and acted on. Indeed, the records of this court will show that in many felony cases the jury are permitted, with the consent of the defendant, to separate and not be kept together, and if it is permissible for that to be done as to the entire panel, it would likewise be permissible by consent for other methods to be pursued, whereby members of separate divisions of the jury were kept together, but the divisions separated, while the jury were not deliberating on the case. It is not shown anywhere in the record, or in brief of counsel, whether the complaint now under consideration occurred after the cause was submitted to the jury for a verdict, or whether there was more than one session following that submission, or whether the objection extends to the guarding of the jury while the evidence was being taken and the trial was being had. For aught that appears from any source, including the briefs in the case, there may never have been but one session of the jury after the final submission of the case to it, and which, of course, would be in the jury room. But, however that may be, we are convinced that no mandatorily required right of defendant was violated in this case, and that, by consenting that the jury might be guarded in the manner stated, all rights that its members should be kept together were waived, and cannot be taken advantage of on this hearing.

Perceiving no error prejudicial to the substantial rights of appellant, the judgment is affirmed.